1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

COHEN MILSTEIN SELLERS & TOLL PLLC
ANDREW N. FRIEDMAN (to file *pro hac vice*)
afriedman@cohenmilstein.com
DOUGLAS J. MCNAMARA (to file *pro hac vice*)
dmcnamara@cohenmilstein.com
SALLY HANDMAKER GUIDO (SBN 281186)
shguido@cohenmilstein.com
1100 New York Ave. NW
Suite 500, West Tower
Washington, DC 20005
Telephone:  (202) 408-4600
Facsimile:  (202) 408-4699

LAW OFFICES OF CHARLES REICHMANN
CHARLES P. REICHMANN (SBN 206699)
cpreichmann@yahoo.com
16 Yale Circle
Kensington, CA 94708
Telephone:  (415) 373-8849

*Attorneys for Plaintiff*

Additional Plaintiff's Counsel Listed on Signature Page

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| **ANGELES MENESES**, individually and on behalf of others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>**FACEBOOK, INC.,**<br><br>Defendant. | CASE NO.  3:18-cv-6583<br><br>**CLASS ACTION COMPLAINT**<br><br>JURY TRIAL DEMANDED |

**CLASS ACTION COMPLAINT**

**CLASS ACTION COMPLAINT**
**AND DEMAND FOR JURY TRIAL**

Plaintiff Angeles Meneses, individually, and on behalf of all others similarly situated, hereby files suit against the Facebook, Inc. ("Facebook" or "Defendant") and alleges the following:

**INTRODUCTION**

1.      Plaintiff files this class action on behalf of all Facebook users who were notified by Facebook that their personal information had been compromised in the breach of Facebook's computer network announced on September 28, 2018 (the "Data Breach").

2.      Facebook admits that 30 million users were impacted. According to Facebook, names and contact information for 15 million users were stolen, while another 14 million users had "additional details taken related to their profiles, such as their recent search history, gender, educational background, geolocation data, birth dates, and lists of people and pages they follow."[1]

3.      This personal information has great value to criminals, researchers, advertisers, and political campaigns.

4.      Specifically, regarding criminals, experts say that these personal details "can be just as important to consumers—and valuable to criminals—as financial data."[2] In fact, such details may be *more* valuable than the loss of a Social Security Number or credit card information. Justin Brookman, director of privacy and technology policy for Consumers Union, the policy and mobilization division of Consumer Reports, said of the Data Breach, "Most data breaches involve

---

[1] Brian Fung, "Facebook says millions of users had phone numbers, search history and location data stolen in recent hack," The Washington Post (Oct. 12, 2018), https://www.washingtonpost.com/technology/2018/10/12/facebook-says-fewer-users-were-affected-by-data-breach-more-information-was-taken/ (last accessed Oct. 24, 2018).

[2] Allen St. John, "Facebook Breach Exposed Personal Data of Millions of Users: Hackers could find out your birthplace, religion, gender, and relationships. What you can do about it.", Consumer Reports (Oct. 12, 2018), https://www.consumerreports.org/digital-security/facebook-data-breach-exposed-personal-data-of-millions-of-users/ (last accessed Oct. 22, 2018).

**CLASS ACTION COMPLAINT**

financial information, but your Facebook account can be misused in a number of ways that are harmful. Accessing your private communications and posts by itself is pretty invasive, but that information could also be used to crack account security questions or to scam you and your friends."[3]

5.      Plaintiff had her personal information taken because of Facebook's lax security practices. Specifically, according to Facebook, the Data Breach was the result of a software vulnerability that permitted access tokens—which enable people to stay logged into Facebook without reentering their password—to be taken.[4]

6.      The vulnerability existed for over a year, from July 2017 to September 2018.[5]

7.      The breach may also have impacted Facebook Login, which permits users to use their Facebook accounts and credentials to sign into accounts with third parties such as Netflix, ESPN, and Spotify.[6]

8.      Facebook, which had previously agreed to a 2011 Federal Trade Commission Consent Order to better protect user privacy and prevent third parties from misappropriating personal information, has admitted that it has had privacy and security issues in ads, in interviews, and before the U.S. Congress.

9.      Facebook was on notice of its privacy issues following, *inter alia*, a recent scandal involving user data and political firm Cambridge Analytica. However, unlike the Cambridge

---

[3] Allen St. John, "Here's What Makes the Facebook Data Breach so Harmful: The hack didn't expose financial info—but personal data can be even more valuable," Consumer Reports (Oct. 12, 2018), https://www.consumerreports.org/digital-security/what-makes-the-facebook-data-breach-so-harmful/ (last accessed Oct. 24, 2018).

[4] *Id.*

[5] Chance Miller, "How to find out if your data was included in Facebook's latest security breach," 9 to 5 Mac (Oct. 13, 2018), https://9to5mac.com/2018/10/13/facebook-data-breach-account-check/ (last accessed Oct. 22, 2018).

[6] *Id.*

**CLASS ACTION COMPLAINT**

Analytica scandal—in which a third-party company erroneously accessed user data—this vulnerability allowed attackers to directly take over user accounts.

10.     While a number of lawsuits have been filed against the Defendant related to this breach, the named plaintiffs were merely guessing as to whether they had been impacted until Facebook began to notify those impacted on or about October 12, 2018.

11.     Facebook has confirmed that the named Plaintiff herein was impacted by the Data Breach.

12.     Plaintiff and similarly situated class members deserve compensation for Facebook's admitted failure to protect their data.

## PARTIES

13.     Plaintiff Angeles Meneses is a citizen and resident of Michigan, over the age of eighteen years.  Plaintiff Meneses created a Facebook account in or about January 2007. On or about October 12, 2018, Plaintiff Meneses received a notification from Facebook that her account and personal information were compromised.

14.     Defendant Facebook, Inc. ("Facebook") is incorporated in Delaware, and its principal place of business is 1 Hacker Way, Menlo Park, CA 94025; it is thus a citizen of Delaware and California.

## JURISDICTION AND VENUE

15.     This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332(d) because this is a class action wherein the amount of controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, there are more than 100 members in the proposed class, and at least one member of the class is a citizen of a state different from Defendant.

16.     This Court has personal jurisdiction over Defendant because Facebook is headquartered in California and conducts business in the state of California.

**CLASS ACTION COMPLAINT**

17.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to these claims occurred in, were directed to, and/or emanated from this District. Venue is also proper because Facebook's terms of service require that claims are resolved "exclusively in the U.S. District Court for the Northern District of California or a state court located in San Mateo County . . ."[7]

## FACTUAL ALLEGATIONS

### A.     Facebook Obtains Significant Personal Information from its Users.

18.     Facebook is a social networking site founded by Mark Zuckerberg. Over the decades, Facebook has amassed under 2.2 billion users.[8]

19.     To create an account, a person is required to share his/her name, email address or mobile phone number, date of birth, and gender.

20.     Facebook users can connect with friends, family, and co-workers. Friends often share news stories, and can express their opinions in posts or comments or through "likes."

21.     Some users' accounts also contain payment card information, and Facebook has actively encouraged banks to join its Messenger app and bring "users' financial information, like credit card transactions and checking account balances" along with them. Specifically, Facebook has asked that banks provide users' financial information, including credit card transactions and checking account balances. The data would be used within Messenger to provide account updates and fraud alerts and enable customer service chats and account management within the Messenger platform.[9]

---

[7] https://www.facebook.com/terms.php (last accessed Oct. 18, 2018).
[8] https://www.facebook.com/business/products/ads/ad-targeting (last accessed Oct. 18, 2018).
[9] Sara Salinas, "Facebook is asking more financial institutions to join Messenger," CNBC.com (Aug. 6, 2018), https://www.cnbc.com/2018/08/06/facebook-messenger-could-soon-feature-your-bank-information.html (last accessed Oct. 18, 2018).

**CLASS ACTION COMPLAINT**

22.     Facebook's Data Policy states that it collects information including:

a.      "the content, communications and other information you provide when you use our Products, including when you sign up for an account, create or share content, and message or communicate with others. This can include information in or about the content you provide (like metadata), such as the location of a photo or the date a file was created. It can also include what you see through features we provide, such as our camera . . . Our systems automatically process content and communications you and others provide to analyze context and what's in them . . ."

b.      "information about the people, Pages, accounts, hashtags and groups you are connected to and how you interact with them across our Products, such as people you communicate with the most or groups you are part of. We also collect contact information if you choose to upload, sync or import it from a device (such as an address book or call log or SMS log history) . . ."

c.      "how you use our Products, such as the types of content you view or engage with; the features you use; the actions you take; the people or accounts you interact with; and the time, frequency and duration of your activities. For example, we log when you're using and have last used our Products, and what posts, videos and other content you view on our Products. We also collect information about how you use features like our camera."

d.      "If you use our Products for purchases or other financial transactions (such as when you make a purchase in a game or make a donation), we collect information about the purchase or transaction. This includes payment information, such as your credit or debit card number and other card information; other account and authentication information; and billing, shipping and contact details."

e.      "We also receive and analyze content, communications and information that other people provide when they use our Products. This can include information about you, such as when others share or comment on a photo of you, send a message to you, or upload, sync or import your contact information."

f.      "We collect information from and about the computers, phones, connected TVs and other web-connected devices you use that integrate with our Products, and we combine this information across different devices you use. For example, we use information collected about your use of our Products on your phone to better personalize the content (including ads) or features you see when you use our Products on another device, such as your laptop or tablet, or to measure whether you took an action in response to an ad we showed you on your phone on a different device."

g.      "Advertisers, app developers, and publishers can send us information through Facebook Business Tools they use, including our social plug-ins (such as the Like button), Facebook Login, our APIs and SDKs, or the Facebook pixel. These partners provide information about your activities off Facebook—including information about your device, websites you visit, purchases you make, the ads you see, and how you use their services—whether or not you have a Facebook account or are logged into

6

**CLASS ACTION COMPLAINT**

Facebook. For example, a game developer could use our API to tell us what games you play, or a business could tell us about a purchase you made in its store. We also receive information about your online and offline actions and purchases from third-party data providers who have the rights to provide us with your information."[10]

23.     As is clear from Facebook's Data Policy, Facebook actively solicits as much information as possible from its users and monetizes that information.[11]

24.     Facebook acknowledges that with the information it holds comes a responsibility to protect it. For example, Facebook claims that it has "top-rate security measures in place to help protect you and your data when you use Facebook." Facebook specifically promises that "[w]hen it comes to your personal information, we don't share it without your permission (unless required by law)."[12]

25.     Facebook further represents in its "Privacy Principles," in relevant part, that:

**We give you control of your privacy**
You should be able to make the privacy choices that are right for you . . .
. . . .

**We design privacy into our products from the outset**
We design privacy into Facebook products with guidance from experts in areas like data protection and privacy law, security, interface design, engineering, product management, and public policy. Our privacy team works to build these diverse perspectives into every stage of product development.

**We work hard to keep your information secure**
We work around the block to help protect people's accounts, and we build security into every Facebook product. Our security systems run millions of time per second to help catch threats automatically and remove them before they ever reach you . . .

**You own and can delete your information**
You own the information you share on Facebook. This means you decide what you share and who you share it with on Facebook, and you can change your mind . . .

---

[10] https://www.facebook.com/about/privacy (last accessed Oct. 22, 2018).

[11] John Constine, "Facebook's Revenue Growth Strategy: Ad Targeting by In-App Behavior," Tech Crunch (Feb. 1, 2012), https://techcrunch.com/2012/02/01/action-spec-ad-targeting (last accessed Oct. 18, 2018).

[12] https://www.facebook.com/about/basics/stay-safe-and-secure/how-youre-protected (last accessed Oct. 24, 2018).

**CLASS ACTION COMPLAINT**

**Improvement is constant**
We're constantly working to develop new controls and design them in ways that explain things to people clearly. We invest in research and work with experts beyond Facebook including designers, developers, privacy professionals and regulators.

**We are accountable**
In addition to comprehensive privacy reviews, we put products through rigorous security testing. We also meet with regulators, legislators and privacy experts around the world to get input on our data practices and policies.[13]

26.     Facebook's Data Policy further represents that Facebook "[p]romotes safety,

integrity, and security" by "us[ing] the information we have to verify accounts and activity, combat

harmful conduct, detect and prevent spam and other bad experiences, maintain the integrity of our

Products, and promote safety and security on and off of Facebook Products."

27.     Facebook's Data Use Policy, updated in January 2015, also provided, in relevant part:

Granting us permission to use your information not only allows us to provide Facebook as it exists today, but it also allows us to provide you with innovative features and services we develop in the future that use the information we receive about you in new ways. While you are allowing use to use the information we receive about you, you always own all of your information. Your trust is important to us, which is why we don't share information we receive about you with others unless we have:

- received your permission
- given you notice, such as by telling you about it in this policy; or
- removed your name and any other personally identifying information from it.[14]

**B. Facebook Has Been on Notice of Privacy Issues and Misuse of its Data and Repeatedly Apologizes, Promising to Do Better the Next Time.**

28.     Facebook has a long history of misleading users about the adequacy of its data

protection. In 2011, Facebook settled with the Federal Trade Commission over charges it had

---

[13] https://www.facebook.com/about/basics/privacy-principles (last accessed Oct. 24, 2018).
[14] https://web.archive.org/web/20141223083330/https://www.facebook.com/full_data_use_policy (last accessed Oct. 25, 2018).

**CLASS ACTION COMPLAINT**

deceived users by "telling them they could keep their information on Facebook private, and then repeatedly allowing it to be shared and made public."[15] Facebook agreed to make its privacy and data sharing policies more prominent and was "barred from making misrepresentations about the privacy or security of consumers' personal information" while also being "required to establish and maintain a comprehensive privacy program designed to address privacy risks associated with the development and management of new and existing products and services, and to protect the privacy and confidentiality and consumers' information."[16] This program was specifically required to be "appropriate to [Facebook's] size and complexity, the nature and scope of [Facebook's] activities, and the sensitivity of the covered information, including . . . . the identification of reasonably foreseeable, material risks, both internal and external, that could result in . . . disclosure of covered information . . ."[17]

29.     Around the same time, following a legal complaint by a European privacy campaigner, Facebook was urged by the Irish Data Protection Commissioner to tighten up app permissions to avoid "friends" data leakage. However, Facebook did not tighten permissions until 2015.[18]

30.     In 2015, Facebook detected that political firm Cambridge Analytica was misusing personal data to create, among other things, targeted political ads. Its lawyers sent a letter to

---

[15] https://www.ftc.gov/news-events/press-releases/2011/11/facebook-settles-ftc-charges-it-deceived-consumers-failing-keep (last accessed Oct. 24, 2018).

[16] *Id.*

[17] Order Containing Consent Order, *In the Matter of Facebook, Inc.*, File No. 092 3184, United States of America Federal Trade Commission, *available at* https://www.ftc.gov/sites/default/files/documents/cases/2011/11/111129facebookagree.pdf.

[18] Natasha Lomas, "Facebook Data Misuse Scandal Affects 'Substantially' More than 50M, Claims Wylie," TechCrunch (Mar. 27, 2018), https://techcrunch.com/2018/03/27/facebook-data-misuse-scandal-affects-substantially-more-than-50m-claims-wylie (last accessed Oct. 18, 2018).

**CLASS ACTION COMPLAINT**

Cambridge Analytica in August of 2016 asking for verification that any such data be deleted. Facebook accepted a letter from Cambridge Analytica that it had done so, but did not bother to follow up or conduct a forensic audit.[19]

31.    When identifying Cambridge Analytica as the entity that misappropriated Facebook data, Facebook founder and CEO Mark Zuckerberg admitted Facebook's negligence in the scandal: "But it's clear now that we didn't do enough to prevent [our] tools from being used for harm as well. That goes for the fake news, foreign interference in elections, and hate speech, as well as developers and *data privacy*. We didn't take a broad enough view of our responsibility, and that was a big mistake." (Emphasis added.)

32.    Zuckerberg made further admissions regarding Facebook's failure to protect the personal information of its users:

a.    "We have a responsibility to protect your data, and if we can't then we don't deserve to serve you. I've been working to understand exactly what happened and how to make sure this doesn't happen again."[20]

b.    "I'm sorry we didn't do more at the time. We're now taking steps to ensure this doesn't happen again."[21]

33.    When called to testify before Congress in April 2018, Zuckerberg was chastened by many congresspeople, including Senator Bill Nelson of Florida, who said, "Let me just cut to the chase. If you and other social media companies do not get your act in order, none of us are going to have privacy anymore . . . We're talking about personally identifiable information that, if not kept by the social media . . . companies from theft, a value that we have in America, being our personal

---

[19] *Id.*

[20] Sam Meredith, Facebook-Cambridge Analytica: A Timeline of the Data Hijacking Scandal," CNBC, (Apr. 10, 2018), https://www.cnbc.com/2018/04/10/facebook-cambridge-analytica-a-timeline-of-the-data-hijacking-scandal.html

[21] Meredith, n. 37, supra.

**CLASS ACTION COMPLAINT**

privacy – we won't have it anymore."[22]

34.     Senator John Thune noted that "this may be your first appearance before Congress, but it's not the first time that Facebook has faced tough questions about its privacy policies," noting a Wired Magazine article that "recently noted that you have a 14-year history of apologizing for ill-advised decisions regarding user privacy." Senator Thune asked, "After a decade of promises to do better, how is today's apology any different?"[23]

35.     Zuckerberg admitted that "we need to now take a more active view in policing the ecosystem" and that, "at the end of the day, this is going to be something where people will measure us by our results . . ."[24]

36.     Zuckerberg was specifically questioned by Senator Tammy Baldwin of Wisconsin regarding whether "Facebook [could] be vulnerable to a data breach or hack . . ." He answered, "there are many kinds of security threats that a company like ours faces, including people trying to break in to our security systems" and stated that if Facebook was hacked, he believed that he would have the duty to inform those impacted.[25]

37.     Facebook committed to "putting stronger protections in place to prevent future abuse of our platform."[26]

**C.     Despite Repeated Promises, Facebook Suffers a Preventable Data Breach.**

38.     According to Facebook, it first became aware of a potential problem on September

---

[22] "Transcript of Mark Zuckerberg's Senate hearing," The Washington Post (Apr. 10, 2018), https://www.washingtonpost.com/news/the-switch/wp/2018/04/10/transcript-of-mark-zuckerbergs-senate-hearing/?noredirect=on&utm_term=.c7f29f9a3e4d (last accessed Oct. 24, 2018).

[23] *Id.*

[24] *Id.*

[25] *Id.*

[26] https://www.facebook.com/help/208040513126776?helpref=popular_topics (last visited Oct. 25, 2018).

**CLASS ACTION COMPLAINT**

14, 2018, when it noticed "an unusual spike of activity."[27]

39.     On September 25, 2018, eleven days later, Facebook's engineering team discovered the security issue that resulted in the Data Breach. Three separate vulnerabilities in Facebook's code had permitted unauthorized individuals to utilize Facebook's "View As" feature—which permits users to see what their profile looks like to others—to steal access tokens enabling users to stay logged into Facebook without reentering their password.[28] With these access tokens, the unauthorized individuals were able to take over users' accounts.[29]

40.     Access tokens are used by Facebook to authenticate users. Facebook describes them as "the equivalent of digital keys that keep people logged in to Facebook so they don't need to re-enter their password every time they use the app."[30]

41.     Ironically, two of the software bugs were the result of Facebook introducing an online tool to *improve* privacy for users, while the third was introduced to ease the uploading of birthday videos.[31]

42.     Once Facebook discovered the Data Breach, it "invalidated the access tokens of almost 90 million accounts that were potentially impacted by the vulnerability" while it investigated

---

[27] Allen St. John, "Facebook Breach Exposed Personal Data of Millions of Users: Hackers could find out your birthplace, religion, gender, and relationships. What you can do about it.", Consumer Reports (Oct. 12, 2018), https://www.consumerreports.org/digital-security/facebook-data-breach-exposed-personal-data-of-millions-of-users/ (last accessed Oct. 22, 2018).

[28] Mike Isaac & Sheera Frenkel, "Facebook Security Breach Exposes Accounts of 50 Million Users," The New York Times (Sept. 28, 2018), https://www.nytimes.com/2018/09/28/technology/facebook-hack-data-breach.html (last accessed Oct. 24, 2018).

[29] https://newsroom.fb.com/news/2018/09/security-update/ (last accessed Oct. 22, 2018).

[30] *Id.*

[31] Mike Isaac & Sheera Frenkel, "Facebook Security Breach Exposes Accounts of 50 Million Users," The New York Times (Sept. 28, 2018), https://www.nytimes.com/2018/09/28/technology/facebook-hack-data-breach.html (last accessed Oct. 24, 2018).

**CLASS ACTION COMPLAINT**

the breach. This resulted in a forcible logout of these users, requiring them to reenter their passwords.[32]

43.     Beginning on September 28, Facebook notified users who were logged out of their accounts of the Data Breach, explaining that the forced logouts were a precaution related to the Data Breach.

44.     Facebook claims that it has determined that the Data Breach took place between September 14 and 27, during which time unauthorized individuals gained access to users' access tokens.[33]

45.     Facebook also claims that it has fixed the vulnerability and temporarily disabled the "View As" feature, but reports suggest the vulnerability existed for over a year, from July 2017 to September 2018, before it was discovered.[34]

46.     Of the breach, Zuckerberg said, "We're taking it really seriously. I'm glad we found this, but it definitely is an issue that this happened in this first place."[35]

### D.     Impacted Users Have Been Greatly Harmed and Face Significant Ongoing Risks.

47.     There are serious implications related to the theft of access tokens, including the fact that someone with a user's token and "access to your account . . . can basically impersonate you online and have access to anything you do on Facebook." This would enable unauthorized

---

[32] https://www.facebook.com/help/securitynotice?ref=sec (last accessed Oct. 24, 2018).

[33] https://www.facebook.com/help/securitynotice?ref=sec (last accessed Oct. 24, 2018).

[34] Chance Miller, "How to find out if your data was included in Facebook's latest security breach," 9 to 5 Mac (Oct. 13, 2018), https://9to5mac.com/2018/10/13/facebook-data-breach-account-check/ (last accessed Oct. 22, 2018).

[35] Mike Isaac & Sheera Frenkel, "Facebook Security Breach Exposes Accounts of 50 Million Users," The New York Times (Sept. 28, 2018), https://www.nytimes.com/2018/09/28/technology/facebook-hack-data-breach.html (last accessed Oct. 24, 2018).

**CLASS ACTION COMPLAINT**

individuals not only to download personal data, but also send messages from your account and possibly send money to other users through Facebook Payments.[36]

48.     Further, it appears that the Data Breach impacted Facebook Login, which permits users to use their Facebook accounts and credentials to sign into accounts with third parties such as Netflix, ESPN, and Spotify.[37] There are tens of thousands of websites and services (including apps, online retailers, and games) in addition to these three that permit Facebook users to take advantage of a "Login with Facebook" feature including: Instagram and WhatsApp (both owned by Facebook), Uber, eBay, LinkedIn, dating websites, Airbnb, and Yelp. With access to the user tokens, unauthorized users could also take over these accounts and use them as if they were the accountholders without having to enter a password. Activities could include changing permissions and privacy settings; posting or viewing information shared by those accounts and any users connected to them; and accessing payment card information.

49.     Facebook asserts that the unauthorized individuals who gained access to users' accounts "were spammers looking to make money through deceptive advertising . . . that present themselves as a digital marketing company, and whose activities were previously known to Facebook's security team . . ."[38]

50.     Despite its active solicitation of personal information and acute awareness of the

---

[36] Allen St. John, "Facebook Breach Exposed Personal Data of Millions of Users: Hackers could find out your birthplace, religion, gender, and relationships. What you can do about it.", Consumer Reports (Oct. 12, 2018), https://www.consumerreports.org/digital-security/facebook-data-breach-exposed-personal-data-of-millions-of-users/ (last accessed Oct. 22, 2018).

[37] *Id.*

[38] Robert McMillan & Deepa Seetharaman, "Facebook Fins Hack Was Done By Spammers, Not Foreign State: Company believes hackers who accessed 30 million accounts masqueraded as digital marketers," The Wall Street Journal (Oct. 17, 2018), https://www.wsj.com/articles/facebook-tentatively-concludes-recent-hack-was-perpetrated-by-spammers-1539821869 (last accessed Oct. 22, 2018).

value of the data it collects, Facebook did not take proper precautions to protect users' accounts.

51.     While Facebook claims that it has fixed the problem, that seems unlikely for impacted users.

52.     For one thing, while Facebook forcibly logged some 90 million users out of their accounts to reset the access tokens that permitted unauthorized individuals to access personal information during the Data Breach, that reset does not log users out of all active sessions. Many Facebook users have their accounts open on multiple devices and/or in multiple browser windows at a time. While the reset forcibly logged users out of their accounts on at least one open or "active" session of Facebook use, that does not mean that users were logged out of all active sessions. To log out of all active sessions, Facebook users must take an additional step and elect to "Log Out of All Sessions" through their account. Without completing this step—and possibly even with this additional step—there is no guarantee that an unauthorized individual does not still have access to the personal information stolen in the Data Breach.[39]

53.     Further, the reset did not address the "Facebook Login" issue, and does not protect users whose information was already accessed.

54.     Moreover, the stolen data is valuable to wrongdoers, who can use the information taken for, *inter alia*, "knowledge-based authentication,"—which is important to setting up and breaking into accounts.[40] For instance, banks and other holders of personal information have moved toward using personal data to safeguard accounts (which may have been compromised in prior data breaches), including information such as your mother's maiden name, pets' names, or the street you

---

[39] Anna Brading, "Big Facebook data breach: 50 million accounts affected," Naked Security by SOPHOS (Sept. 28, 2018), https://nakedsecurity.sophos.com/2018/09/28/big-facebook-breach-50-million-accounts-affected/ (last accessed Oct. 24, 2018).

[40] Dave Lee, "Facebook hack victims will not get ID theft protection," BBC News (Oct. 12, 2018), https://www.bbc.com/news/technology-45845431 (last accessed Oct. 22, 2018).

**CLASS ACTION COMPLAINT**

grew up on. As a result of the Data Breach, such authentication information is now in the hands of

unauthorized individuals who can use it to access or create accounts.

55.     Further, so-called "phishing" schemes trying to extort money seem more legitimate if

a cybercriminal lists personal information.

56.     The Data Breach also makes users susceptible to ransomware or blackmailing attacks,

since people use Facebook to "talk about things they wouldn't want their employer or their spouse to

know. Hackers can do nasty stuff with that." [41]

57.     The Electronic Frontier Foundation has noted that the type of information exposed in

the Data Breach is "extra-valuable to criminals" given that it is highly accurate, having been entered

by users themselves, whereas as personal information stolen from prior data breaches was inferred

from consumer behavior. [42]

58.     Despite its clear negligence in protecting consumers from unlawful data breaches and

the significant harms they face as a result, Facebook has already announced that it will not be

providing the bare minimum relief that many companies provide after a breach—identity theft

protection services. [43]

**E.      Plaintiff's Experience.**

59.     Plaintiff Meneses has had a Facebook account since approximately January 2007.

60.     Plaintiff first heard about the Facebook data breach through an online news article.

61.     On or about October 12, 2018, Plaintiff received a notification from Facebook that

her account had been compromised in the Data Breach announced on September 28, 2018. As of this

---

[41] Allen St. John, "Here's What Makes the Facebook Data Breach so Harmful: The hack didn't expose financial info—but personal data can be even more valuable," Consumer Reports (Oct. 12, 2018), https://www.consumerreports.org/digital-security/what-makes-the-facebook-data-breach-so-harmful/ (last accessed Oct. 24, 2018).
[42] *Id.*
[43] *Id.*

**CLASS ACTION COMPLAINT**

date, Facebook asserts that attackers had accessed Plaintiff's name, primary email address and the most recently added phone number.

## CLASS ALLEGATIONS

62.     Plaintiff re-alleges and incorporates by reference herein all of the allegations contained in paragraphs 1 through 61.

63.     Plaintiff brings this nationwide class action pursuant to Rule 23(b)(2) and 23(b)(3) of the Federal Rules of Civil Procedure, individually and on behalf of all members of the following class (the "Nationwide Class"):

> All persons identified by Facebook's records whose personal information was accessed in the data breach announced on September 28, 2018.

64.     In addition, Plaintiff brings this action on behalf of a Michigan subclass (the "Michigan Subclass") defined as:

> All persons in Michigan identified by Facebook's records whose personal information was accessed in the data breach announced on September 28, 2018.

65.     Excluded from the Class are the following individuals and/or entities: Defendant and its parents, subsidiaries, affiliates, officers and directors, current or former employees, and any entity in which Defendant has a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; any and all federal, state or local governments, including but not limited to their departments, agencies, divisions, bureaus, boards, sections, groups, counsels and/or subdivisions; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

66.     Plaintiff reserves the right to modify or amend the definition of the proposed Class before the Court determines whether certification is appropriate.

67.     **Numerosity**: The Class is so numerous that joinder of all members is impracticable.

**CLASS ACTION COMPLAINT**

Facebook has identified millions of Facebook users whose personal information was accessed in the Data Breach, and the Class is apparently identifiable within Facebook's records.

68.     **Commonality**: Questions of law and fact common to the Class exist and predominate over any questions affecting only individual class members. These include:

    a.   Whether Facebook breached its contract to protect its users' personal information;

    b.   Whether and when Facebook learned of the Data Breach and whether its response was adequate;

    c.   Whether Facebook owed a duty to the Class to exercise due care in collecting, storing, safeguarding and/or obtaining their personal information;

    d.   Whether Facebook breached that duty;

    e.   Whether Plaintiff and the other Class members are entitled to actual, statutory, or other forms of damages, and other monetary relief.

69.     **Typicality**: Plaintiff's claims are typical of those of other Class members because all had their personal information accessed as a result of the Data Breach, due to Facebook's neglect and breach of contract.

70.     **Adequacy**: Plaintiff will fairly and adequately represent and protect the interests of the members of the Class. Plaintiff's Counsel are competent and experienced in litigating privacy-related class actions.

71.     **Superiority**: A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all the members of the Class is impracticable. Individual damages for any individual Class member are likely to be insufficient to justify the cost of individual litigation, so that in the absence of class treatment, Defendant's misconduct would go unpunished. Furthermore, the adjudication of this controversy through a class action will avoid the possibility of inconsistent and potentially conflicting adjudication of the

asserted claims. There will be no difficulty in the management of this action as a class action.

72.     Class certification is also appropriate under Fed. R. Civ. P. 23(a) and (b)(2) because Defendant has acted or refused to act on grounds generally applicable to the Class, so that final injunctive relief or corresponding declaratory relief is appropriate as to the Class as a whole.

## CAUSES OF ACTION

## COUNT I

### BREACH OF CONTRACT
**(Asserted by the Nationwide Class)**

73.     Plaintiff re-alleges and incorporates by reference herein all of the allegations contained in paragraphs 1 through 72.

74.     Plaintiff and Class members had agreements with Facebook through one or more of Facebook's policies and practices interfaces.

75.     Plaintiff and Class members met all or substantially all of their contractual obligations, including providing certain information required to create an account.

76.     There is not one integrated contract that spells out Facebook's obligations to the Class, but those obligations can be determined by reference to Facebook's course of dealing with the Class, industry practice, and from various webpages created by Facebook, including Facebook's "How You're Protected" section (https://www.facebook.com/about/basics/stay-safe-and-secure/how-youre-protected); Facebook's Privacy Principles (https://www.facebook.com/about/basics/privacy-principles), and Facebook's Data Use Policy (https://web.archive.org/web/20141223083330/https://www.facebook.com/full_data_use_policy).

77.     Facebook enjoyed the financial benefits of an advertising platform provided by its social network. Users enjoyed the benefit of the network with limitations placed on how their personal information can be shared.

78.     Plaintiff's personal information on Facebook is of considerable value. This is

19

**CLASS ACTION COMPLAINT**

demonstrated by the billions paid by advertisers to Facebook.

79.    Facebook failed to adhere to its policies and keep its promises to Plaintiff and Class members, breaching its agreement to users.

80.    As a result of the breach, Plaintiff and Class members have been harmed and have suffered damages by losing the value of their personal information.

## COUNT II

### BREACH OF IMPLIED DUTY TO PERFORM WITH REASONABLE CARE
### (Asserted by the Nationwide Class)

81.    Plaintiff re-alleges and incorporates by reference herein all of the allegations contained in paragraphs 1 through 72.

82.    Plaintiff and Class members had agreements with Facebook through one or more of Facebook's policies and practices interfaces.

83.    Plaintiff and Class members met all or substantially all of their contractual obligations, including providing certain information required to create an account.

84.    There is not one integrated contract that spells out Facebook's obligations to the Class, but those obligations can be determined by reference to Facebook's course of dealing with the Class, industry practice, and from various webpages created by Facebook, including Facebook's "How You're Protected" section (https://www.facebook.com/about/basics/stay-safe-and-secure/how-youre-protected); Facebook's Privacy Principles (https://www.facebook.com/about/basics/privacy-principles), and Facebook's Data Use Policy (https://web.archive.org/web/20141223083330/https://www.facebook.com/full_data_use_policy).

85.    One of Facebook's obligations is to provide Class members with a secure platform that gives users control over who can view their activities.

86.    Another of Facebook's obligations is to protect users and their data from unwanted intrusions by maintaining adequate safety and security measures.

**CLASS ACTION COMPLAINT**

87.     Under California law, Facebook was required to perform its contractual obligations competently and with reasonable care. Facebook breached that duty by taking inadequate security measures to protect user data, even after being on notice that unauthorized individuals were seeking to gain access to user data.

88.     Had Facebook used reasonable care, it would have identified the threats and prevented the Data Breach.

89.     As a result of Facebook's failure to provide its agreed privacy and security services competently and using reasonable care, Plaintiff and Class members have lost the value of their personal information and failed to receive the benefit of their bargain. They are entitled to damages in an amount to be proven at trial.

## COUNT III

### QUASI-CONTRACT CLAIM FOR RESTITUTION
### (Asserted by the Nationwide Class)

90.     Plaintiff re-alleges and incorporates by reference herein all of the allegations contained in paragraphs 1 through 72.

91.     As an alternative to Counts I and II, and in the events the parties' agreements are found not to cover Facebook's securing of users' data, Plaintiff seeks restitution in quasi-contract.

92.     Facebook's representations made its data privacy and security appear more robust and effective than it really was—leading Plaintiff and the Class to lose the value of their personal information.

93.     Facebook knew about, accepted, and benefitted from Plaintiff's and Class members' use of its platform.

94.     Under the circumstances, it would be inequitable for Facebook to benefit from its failure to secure users' data, detect the Data Breach in a timely manner, and notify Plaintiff and Class members in a timely manner.

**CLASS ACTION COMPLAINT**

95.     To avoid injustice, Plaintiff and the Class accordingly seek restitution and/or disgorgement in profits in an amount to be proven at trial.

## COUNT IV

### NEGLIGENCE
### (Asserted by the Nationwide Class)

96.     Plaintiff re-alleges and incorporates by reference herein all of the allegations contained in paragraphs 1 through 72.

97.     Facebook owed a duty to Plaintiff and Class members to exercise reasonable care in obtaining, using, and protecting their personal information from unauthorized third parties.

98.     Facebook knew that the personal information of Plaintiff and the Class had value—indeed, it made Facebook an attractive platform for advertising and netted it billions of dollars.

99.     Given the nature of the information, Facebook had a special relationship with Plaintiff and Class members. Plaintiff and Class members signed up for Facebook's services and agreed to provide their information with the understanding that Facebook would undertake safeguards and would inform Plaintiff and the Class of any privacy intrusions.

100.     Facebook's duty to use reasonable data security measures also arose under Section 5 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interested and enforced by the FTC, the unfair practices of failing to use reasonable measures to protect personal information by companies such as Facebook. Various FTC publications and data security breach orders further form the basis of Facebook's duty. In addition, individual states have enacted statutes based upon the FTC Act that also created a duty.

101.     Facebook violated its obligation to protect Plaintiff's personal information by failing to take adequate safeguards to prevent unauthorized access gained as a result of the Data Breach.

102.     Facebook also breached its duties by failing to adopt earlier the safeguards it

**CLASS ACTION COMPLAINT**

promised in the 2011 FTC Consent Order and that it is now promising to employ to protect Plaintiff's and Class members' personal information.

103.     The injury and harm suffered by Plaintiff and Class members was reasonably foreseeable.

104.     Absent Facebook's wrongful and negligent breach of its duties owed to Plaintiff and Class members, their information would not have been improperly disclosed to unauthorized users. Facebook's negligence was a direct and proximate cause of the misuse and disclosure of Plaintiff's and Class members' information, resulting in damages – the Plaintiff's loss of personal information that possesses value to Plaintiff and third parties.

## COUNT V

### VIOLATION OF THE UNFAIR COMPETITION LAW (UCL)
### (Asserted by the Nationwide Class)

105.     Plaintiff re-alleges and incorporates by reference herein all of the allegations contained in paragraphs 1 through 72.

106.     California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 prohibits "any unlawful, unfair or fraudulent business act or practice."

107.     A business act or practice is "unlawful" when it is proscribed by some other statute, regulation or constitutional provision.

108.     Facebook's terms of service required it to undertake safeguards to protect Plaintiff's and Class member's data from being disclosed to unauthorized individuals.

109.     Facebook engaged in business acts or practices that were proscribed by law, including the 2011 FTC Consent Decree; Cal. Civ. Code §§ 1798.80, *et seq.* (the California Customer Records Act); Mich. Comp. Laws Ann. §§ 445.903, *et seq.* (the Michigan Consumer Protection Act); and the FTC Act, 15 U.S.C. § 45. Facebook's conduct is also unfair because it is substantially injurious to consumers, and is immoral, unethical, oppressive and unscrupulous. Facebook's conduct is not

outweighed by any countervailing benefit to consumers or competition, and Facebook's conduct, and the harm it causes, is not reasonably avoidable by consumers.

110.    Facebook monitors, collects, and records users' habits and other information in order to sell it to third parties for profit, and does so without adequately protecting the information collected.

111.    Had consumers known that Facebook would not adequately protect their personal information, they would not have utilized the platform or would have shared less personal information.

112.    Facebook prevented consumers from protecting their right to privacy and their right to control the dissemination of their personal information by failing to take adequate precautions to prevent the Data Breach.

113.    As a direct and proximate result of Facebook's unlawful and unfair business acts and practices, Plaintiff and the Class suffered injury in fact and lost money or property, including their loss of the benefit of their bargain. Plaintiff shared personal information with Facebook under the promise that Facebook would limit access to that personal information consistent with the privacy settings. Facebook failed to deliver on that promise and permitted unauthorized individuals to gain access to users' valuable data and personal information. Facebook's conduct has taken from Plaintiff the opportunity to control how their personal information is used, and her personal information now has a diminished value.

114.    Because of Facebook's unlawful and unfair business acts and practices, Plaintiff and Class members are entitled to relief, including attorneys' fees and costs, restitution, declaratory relief, and a permanent injunction enjoining Facebook from its unlawful and unfair practices. Plaintiff also seeks reasonable attorneys' fees and costs under applicable law, including Federal Rule of Civil Procedure 23 and California Code of Civil Procedure § 1021.5.

**CLASS ACTION COMPLAINT**

### COUNT VI

**MICHIGAN CONSUMER PROTECTION ACT**
**(Asserted by the Michigan Subclass)**

115.    Plaintiff re-alleges and incorporates by reference herein all of the allegations contained in paragraphs 1 through 72.

116.    Facebook engaged in unfair, unconscionable, and deceptive methods, acts, and practices in the conduct of trade or commerce, including representing that its goods and services had characteristics that they did not, representing that its goods and services were of a particular standard when they were not, and advertising its goods and services with intent not to dispose of them as advertised, in violation of Mich. Comp. Laws Ann. § 445.903(1). This includes but is not limited to the following:

    a.  Failing to enact privacy and security measures to protect Plaintiff and Michigan Subclass members' personal information from unauthorized disclosure, release, data breaches, and theft, which was a direct and proximate cause of the Data Breach;

    b.  Failing to take proper action following known security risks, which was a direct and proximate cause of the Data Breach;

    c.  Knowingly and fraudulently misrepresenting that it would maintain adequate data privacy and security practices and procedures to safeguard Michigan Subclass members' personal information from unauthorized disclosure, release, data breaches, and theft;

    d.  Omitting, suppressing, and concealing the material fact of the inadequacy of its privacy and security protections for Michigan Subclass members' personal information; and

    e.  Failing to maintain the privacy and security of Michigan Subclass members' personal information, in violation of duties imposed by applicable federal and state laws,

directly and proximately causing the Data Breach.

117.    As a direct and proximate result of these practices, Michigan Subclass members suffered injuries to legally protected interests, as described above, including but not limited to their legally protected interest in the confidentiality and privacy of their personal information and the loss of value of their personal information.

118.    The above unfair and deceptive practices and acts by Facebook were immoral, unethical, oppressive, and unscrupulous. These acts caused substantial injury to Plaintiff and Michigan Subclass members that they could not reasonably avoid, and this substantial injury outweighed any benefits to consumers or to competition. These areas were within the penumbra of common law, statutory, or other established concepts of unfairness.

119.    Facebook knew or should have known that its computer systems and data security practices were inadequate to safeguard Michigan Subclass members' personal information and that risk of a data breach or theft was high. Facebook's actions in engaging in the above-named unfair practices and deceptive acts were negligent, knowing and willful, and/or wanton and reckless with respect to the rights of Michigan Subclass members.

120.    Plaintiff and Michigan Subclass members seek injunctive relief to enjoin Facebook from continuing its unfair and deceptive acts; monetary relief against Facebook measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $250 for Plaintiff and each Michigan Subclass member; reasonable attorneys' fees; and any other just and proper relief available under Mich. Comp. Laws. Ann. § 445.911.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff, on behalf of herself and all Class members, requests judgment against the Defendant and that the Court grant the following:

A.    An order certifying a class or classes and appointing Plaintiff and her Counsel

to represent the Class;

        B.     An order enjoining Facebook from engaging in the wrongful conduct alleged herein concerning disclosure and inadequate protection of Plaintiff's and Class members' personal information;

        C.     An award of compensatory, statutory, and punitive damages, in an amount to be determined;

        D.     An award of reasonable attorneys' fees, costs, and litigation expenses, as allowable by law; and

        E.     Such other and further relief as this Court may deem just and proper.

## JURY TRIAL DEMAND

Plaintiff hereby demands a jury trial for all issues so triable of right.

DATED this 29th day of October 2018.

                                      Respectfully submitted,

                                      s/ *Charles Reichmann*

                                      Charles P. Reichmann (SBN 206699 )
**LAW OFFICES OF CHARLES REICHMANN**
16 Yale Circle
Kensington, CA 94708
Telephone:  (415) 373-8849
cpreichmann@yahoo.com

Andrew N. Friedman (to file *pro hac vice*)
Douglas J. McNamara (to file *pro hac vice*)
Sally Handmaker Guido (SBN 281186)
**COHEN MILSTEIN SELLERS & TOLL PLLC**
1100 New York Ave. NW
East Tower, 5th Floor
Washington, DC  20005
Telephone:  (202) 408-4600
Facsimile:   (202) 408-4699
afriedman@cohenmilstein.com
dmcnamara@cohenmilstein.com

**CLASS ACTION COMPLAINT**

shguido@cohenmilstein.com

Karen Hanson Riebel (to file *pro hac vice*)
Kate M. Baxter-Kauf (to file *pro hac vice*)
Arielle S. Wagner (to file *pro hac vice*)
**LOCKRIDGE GRINDAL NAUEN PLLP**
100 Washington Avenue South
Suite 2200
Minneapolis, MN 55401
Telephone:  (612) 596-4097
Facsimile:   (612) 339-0981
khriebel@locklaw.com
kmbaxter-kauf@locklaw.com
aswagner@locklaw.com

***Attorneys for Plaintiff***

**CLASS ACTION COMPLAINT**